# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

LISA SILSBEE,

                            Plaintiff,

       v.                                    3:14-CV-345
                                               (GTS/ATB)

COMMISSIONER OF SOCIAL SECURITY,

                            Defendant.

PETER A. GORTON, ESQ., for Plaintiff
AMANDA LOCKSHIN, Special Asst. U.S. Attorney for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

## REPORT-RECOMMENDATION

This matter was referred to me for report and recommendation by the Honorable Glenn T. Suddaby, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(d). This case has proceeded in accordance with General Order 18.

## I.   PROCEDURAL HISTORY

On April 26, 2011, plaintiff filed an application for Disability Insurance Benefits ("DIB"), alleging disability beginning January 29, 2010. (Administrative Transcript ("T") at 136-37). The applications were denied initially on June 30, 2011. (T. 79-82). Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") which was held on November 8, 2012. (T. 28-70). On January 11, 2013, ALJ F. Patrick Flanagan found plaintiff was not disabled. (T. 11-24). The ALJ's decision became the Commissioner's final decision when the Appeals Council denied plaintiff's request for review on October 2, 2009. (T. 1–5).

## II.   GENERALLY APPLICABLE LAW

### A.   Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ."  42 U.S.C. § 1382c(a)(3)(A).  In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920 to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.  If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner ] will consider him disabled without considering vocational factors such as age, education, and work experience . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the

residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920. The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that her impairment prevents her from performing her past work, the burden then shifts to the Commissioner to prove the final step. *Id.*

### B. Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision. *Selian v. Astrue*, 708 F.3d at 417; *Brault v. Soc. Sec. Admin, Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g)). Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Talavera v. Astrue*, 697 F3d 145, 151 (2d Cir. 2012). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Id.* However, this standard is a very deferential standard of review " – even more so than the 'clearly erroneous standard.'" *Brault*, 683 F.3d at 448.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record

contains substantial support for the ALJ's decision. *Id. See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ cannot "'pick and choose' evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112, at *6 (W.D.N.Y. Dec. 6, 2010).

## III.  FACTS

Plaintiff is a 39 year old, single mother with two children, ages 17 and 15.[1] Plaintiff has a high school diploma. (T. 34). Plaintiff's last employment was for Canon Business Solutions, where her duties included taking care of the mail and packages. (T. 34). She was also required to lift boxes of paper up to fifty pounds, push the paper around on a cart, and take the paper around to printers and copiers. She was responsible for keeping the printers and copiers loaded and cleaned. (T. 35). Plaintiff testified that in the beginning she was very busy, but business slowed down, and she was ultimately laid off due to the lack of business. (T. 35, 37). Plaintiff stated that, although she stopped working due to lack of business, she "was sore a lot" when she was working and only continued working "because [she] had to." (T. 37). She stopped working in January of 2010 and has not worked since that time. (T. 40).

---

[1] At the time of the hearing in November of 2012, plaintiff was 36, and her children were 14 and 12. (T. 32-33).

4

After the lay-off, plaintiff collected unemployment benefits until the fourth quarter of 2011. (T. 38). Plaintiff testified that she looked for a job after she was laid off, but "it wasn't easy trying to find a job that [she] was capable of doing." (T. 39). When the ALJ asked plaintiff what job she thought she would be able to do, plaintiff stated that she thought she would be able to perform a "sit down job." That is what she was "hoping" for, although she did not know if she would be able to do such a job. (T. 39). Plaintiff also testified that she was not sure how an employer would "feel" about her fibromyalgia and the unpredictable nature of the condition. (T. 39). Plaintiff testified that it had been six years since she had been diagnosed with fibromyalgia, and that the pain had gotten worse. (T. 40-41). She stated that she had good days, but some days were "absolutely terrible" (T. 41). She probably had ten "good days out of a month." (*Id.*) On a bad day, she felt radiating pain that made her body "jolt." (T. 42). Her pain is sometimes so bad that she takes "medicine to help [calm] it down." (*Id.*)

Plaintiff testified that, in addition to the fibromyalgia, she has fluid on her right knee, which caused her to favor her left knee, resulting in pain in both knees. (T. 43). She testified that she woke up one night, and her pain was so severe that she could not move her right leg. (T. 43-44). Plaintiff also testified that she suffers from plantar fasciitis in her left foot, and that the doctor wanted her to be in a "boot," but her insurance would not pay for it. (T. 44). Later, orthotics were prescribed, but her insurance would not pay for them. (T. 44). Plaintiff testified that she no longer had trouble with her wrist. (T. 44).

Plaintiff also testified that she has frequent blood clots in her legs from smoking

and taking birth control pills. (T. 45). The ALJ asked plaintiff if there was anything "else going on" with her back, other than the fibromyalgia. (T. 45). Plaintiff testified that she had degenerative disc disease, which makes her back "throb" when she sits down. (T. 46). Plaintiff takes a lot of different medications and lays down when her back bothers her. (*Id.*) The only narcotic medication that plaintiff takes is Oxycodone, but she takes it daily in addition to medications that are specifically for fibromyalgia. (T. 47). Plaintiff also takes a variety of other medications in including Savella; aspirin; Levothyroxine; Lunesta; Zanaflex; Topamax; Lidoderm; Abilify; Pravachol; Naproxin; and Gabapentin. (T. 57-59). She also testified that she "had" Xanax. (T. 58).

Plaintiff testified that one side effect of her medications is forgetfulness and "tiredness." (T. 48, 59). She attributed this condition to her medications because she "wasn't like this before I started taking all this medicine." (T. 48). Plaintiff stated that she spent a lot of time on the couch, but not lying down. (T. 49). She lies down "a couple of times" per day for about twenty minutes to one half hour. (*Id.*) With respect to her ability to sit, plaintiff stated that every day was different, and that she was fine sitting at the hearing, but if she had to sit at a computer all day with her hands out, that would "bring on the pain." (T. 49-50). However, plaintiff could not estimate how long it would take for the pain to begin. (T. 50-51). When she feels the pain coming on, she does "a lot of stretching." (T. 51).

Plaintiff testified that on a "good" day, there was no limit on how long she could be on her feet, but that she had mostly "in between" days, during which she was "very limited" in being on her feet. (T. 51). She stated that she would be unable to stand for

6

five hours per day. (T. 52). Plaintiff testified that she has fallen down the stairs "several times," and that she is not a person who can "handle" the pain. (T. 53). Plaintiff testified that her children are very helpful, and they are not "into . . . the school stuff" such as wanting to go to sporting events, so plaintiff is not "on the go constantly." (T. 53-54). Everyone shared the household duties. Plaintiff testified that she was not a good cook, so she and her children had dinner at her mother's house six out of seven days per week. (T. 54). Plaintiff testified that she drove every day to get to her mother's house for dinner, but then stated that she tried not to drive *that often*.[2] (T. 33).

Plaintiff stated that she took care of her own personal needs, and she was trying to walk every day, until her feet began bothering her. (T. 55). She stated that she was told that she needed to do more exercise. (*Id.*) She does not engage in social activities, but she does go shopping with her mother for a couple of hours at a time, although her mother carries everything. (T. 55-56).

In response to questioning by her attorney, plaintiff testified that she is able to climb the stairs to her apartment, but she holds the railing and walks very slowly because of her knees. (T. 59). She stated that she offers her son money to do the dishes and vacuum for her, but that on a good day, she can do the dishes. (T. 60). On a good day, she can also sweep or mop the floor because her kitchen is small. (T. 61). For "big" things, like putting in the air conditioners, plaintiff's mother comes to her house

---

[2] Later plaintiff testified that her condition did not impact her driving "too much," and that it was "no different than sitting in a chair." (T. 63). She stated that her car seat has a "balloon" in it which makes it a little more comfortable when she drives. (T. 64).

to help out. (*Id.*)

Plaintiff testified that on a bad day, she could only sit for fifteen minutes before she had to stand up or lie down, and she could only stand for ten minutes before she had to sit or lie down. (T. 62). Before her feet started bothering her, she could walk from the car to the store, but then she testified that she could walk the same distance even though her feet were bothering her.[3] (T. 63). She testified that she does not sleep well, and that she has nightmares. (T. 64). She wakes up in the middle of the night with pain. (T. 64-65). Plaintiff bends very carefully, but her back aches if she bends. (T. 65). She stated that she was not sure if it was her "condition" or the medications, but it was difficult for her to focus. (T. 65-66).

Plaintiff testified that she gets very grouchy. (T. 66). However, she does not want to complain, so she "gets quiet." (T. 66). Her mother can tell when she is in pain. (*Id.*) Plaintiff stated that her family "understood" her problems. (T. 67). At the end of the hearing, plaintiff testified that she had a pending appointment with "mental health" because her older son was treating her poorly, and she thought it would be "nice" to speak with someone about that. (T. 67). The ALJ kept the record open for any further mental health records, but plaintiff never filed any additional documents which related to subsequent mental health care.

Plaintiff's treating medical providers are from Lourdes Memorial Hospital. There are substantial records from the treating sources, including two Residual Functional Capacity ("RFC") Evaluations. One RFC evaluation is signed by Dr.

---

[3] Plaintiff stated that the plantar fasciitis had only been bothering her for approximately six to eight months at the time of the hearing. (T. 63).

Darlene Denzien, D.O. and is dated November 1, 2010. (T. 227-28). The second treating source RFC is dated October 24, 2012, and it is signed by both Dr. Denzien and Physician Assistant ("PA") Paul Hodgeman, RPAC. (T. 348-53). The record also contains many narrative reports by Dr. Denzien and PA Hodgeman, from before and after plaintiff's disability onset date. (T. 204-300, 348-53, 354-449). Some of the reports are written and signed by Dr. Denzien alone. (T. 222, 224, 229, 233, 235, 237, 239, 241, 244, 246, 248, 251, 256, 258, 260, 263 ). Many of the reports are authored by PA Hodgeman alone. (T. 208, 210, 212, 214, 216, 218, 220, 365-67, 370-71, 376, 381, 383, 385, 387, 389, 391, 393, 395, 397, 399, 402, 404-405, 408, 411, 413).[4]

In 2009,[5] prior to her onset date, plaintiff was referred to Dr. John Brosnan, an orthopedic specialist to examine her right knee. (T. 198-200). Plaintiff has had both a physical and a mental consultative examination. (T. 302-12). The consultative physical examination was performed on June 13, 2011 by Dr. Justine Magurno, M.D., and the consultative mental examination was performed on the same day by Sara Long, Ph.D. (T. 302-306 (mental), 307-312 (physical)). Dr. Lawrence Wiesner, an orthopedic specialist submitted a physical examination report and an RFC form, both dated August 10, 2012. (T. 335-47). Psychologist Robert Russell, Ed.D. performed an evaluation, dated March 29, 2012. (T. 331-34). Plaintiff was also referred to Dr. Aryn Sheth, M.D. at Broome Oncology, LLC for review of her thrombophlebitis in 2010. (T. 201-203).

---

[4] There are other documents in the transcript that are associated with the narrative reports, but the court has cited only to the typewritten narrative reports, authored specifically by Dr. Denzien and PA Hodgeman.

[5] The record also contains a general medical report, authored by PA Aspen D'Angelo on March 3, 2009 (T. 197), prior to plaintiff's onset date.

Further details regarding the medical and other evidence, including the medical opinion evidence, are discussed below as necessary to address the issues raised by plaintiff.

## IV.    THE ALJ'S DECISION

After finding that plaintiff met her insured status through June 30, 2015, and that plaintiff had not engaged in substantial gainful activity since her alleged onset date of January 29, 2010, the ALJ found that plaintiff had the following severe impairments at step two of the sequential evaluation: fibromyalgia; history of thrombophlebitis; prescription narcotic pain medication dependence; and obesity. (T. 13-17).  The ALJ found that although plaintiff had been "medically managed" for back and joint pain; plantar fasciitis; hypothyroidism; gastroesophageal reflux disease; tobacco abuse; and headaches, these conditions were not "severe impairments." (T. 15).  The ALJ also found that plaintiff's depression was not severe. (T. 15-16).  Even though the ALJ found that many of plaintiff's stated impairments were not severe, the ALJ specifically stated that he considered "the limiting effects of all the claimant's impairments, even those that are not severe, . . . in determining the claimant's residual functional capacity. . . ." (T. 15).

At step three of the disability analysis, the ALJ found that plaintiff did not have a Listed Impairment. (T. 17-18).  In making this determination, the ALJ considered plaintiff's fibromyalgia and considered her history of thrombophlebitis under Listing 1.11 which addresses chronic venous insufficiency of a lower extremity. (T. 17).  The ALJ considered plaintiff's prescription pain medication dependency under Listing 12.09, which includes consideration of Listings 12.02 (organic mental disorders); 12.04

(depressive syndrome); 12.06 (anxiety disorders); 12.08 (personality disorders); 11.14 (peripheral neuropathies); 5.05 (liver damage); 5.00 (gastritis); 5.08 (pancreatitis); and 11.03, 11.03 (seizures). (T. 17-18) *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.09(A)-(I)[6]. The ALJ even considered plaintiff's obesity in his step three analysis, "in the context of the overall evidence," even though there is no longer a listing for obesity. (T. 18).

The ALJ found at step four of the analysis that plaintiff had the RFC to perform sedentary work, is able to lift and/or carry ten pounds occasionally and less than ten pounds frequently. (T. 18). The ALJ found that plaintiff could stand and/or walk for two hours and sit for six hours in an eight-hour work day. (*Id.*) Plaintiff is able to concentrate on, remember and carry out simple tasks, but has occasional difficulty concentrating on, remembering, and carrying out complex tasks. (*Id.*) The ALJ specified the weight that he afforded to the medical evidence. (T. 21-22).

In making the RFC determination, the ALJ stated that he considered all the plaintiff's symptoms, and the extent that those symptoms could "reasonably be accepted as consistent with the objective medical evidence and other evidence in accordance with 20 C.F.R. § 404.1529 and Social Security Ruling ("SSR") 96-4p and 96-7p. Finally, the ALJ stated that he considered opinion evidence pursuant to 20 C.F.R. § 404.1527 and SSRs 96-2p, 96-5p, 96-6p, and 06-3p. (T. 18). After considering the

---

[6] Listing 12.09 is entitled "Substance Addiction Disorders," defined as "[b]ehavioral changes or physical changes associated with the use of substances that affect the central nervous system." The required level of severity under Listing 12.09 is met when the requirements in any of subsections (A) through (I) are met. Thus, in order to fully consider Listing 12.09, the ALJ would also have to consider whether plaintiff met the listing level severity in any of the enumerated subsections.

evidence, the ALJ found that plaintiff was not fully credible with respect to the intensity, persistence, and limiting effects of her symptoms. (T. 19). In making the credibility determination, considered the plaintiff's testimony in addition to the medical evidence. (T. 19-21).

At step four, the ALJ also determined that plaintiff's RFC would prevent her from performing her past relevant work. (T. 23). At step five, the ALJ determined that plaintiff's non-exertional impairments would not significantly limit the full range of sedentary work that plaintiff could perform. (T. 23-24). Thus, the ALJ used the medical-vocational rules "as a guideline" to find that plaintiff was not disabled, based upon her age, education, and prior work experience. (*Id.*)

## V.    ISSUES IN CONTENTION

Plaintiff raises the following arguments:

1.    The ALJ failed to assess all severe impairments and include the true limiting effect of those impairments in the RFC determination, resulting in an RFC evaluation that is not supported by substantial evidence. (Pl.'s Br. at 7-18) (Dkt. No. 11).

2.    The ALJ improperly weighed the medical evidence. (Pl.'s Br. at 18-22).

3.    The ALJ should have obtained testimony from a Vocational Expert ("VE"). (Pl.'s Br. at 23-25).

Defendant argues that the Commissioner's determination is supported by substantial evidence and should be affirmed. (Def.'s Br.) (Dkt. No. 14). For the following reasons, this court agrees with the defendant and will recommend dismissing the complaint.

## DISCUSSION

## VI. SEVERE IMPAIRMENT

### A. Legal Standard

The claimant bears the burden of presenting evidence establishing severity at step two of the disability analysis. *Briggs v. Astrue*, No. 5:09–CV–1422 (FJS/VEB), 2011 WL 2669476, at *3 (N.D.N.Y. Mar. 4, 2011) (Report-Recommendation), *adopted*, 2011 WL 2669463 (N.D.N.Y. July 7, 2011). A severe impairment is one that significantly limits the plaintiff's physical and/or mental ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c); *see also* 20 C.F.R. § 404.1521(a) (noting that an impairment is not severe at step two if it does not significantly limit a claimant's ability to do basic work activities).

The Regulations define "basic work activities" as the "abilities and aptitudes necessary to do most jobs," examples of which include, (1) physical functions such as walking, standing, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers and usual work situations; and (6) dealing with changes in a routine work setting. 20 C.F.R. § 404. 1521(b). "Severity" is determined by the limitations imposed by an impairment, and not merely its by diagnosis. The mere presence or diagnosis of a disease or impairment is not, by itself, sufficient to deem a condition severe. *Hamilton v. Astrue*, No. 12-CV-6291, 2013 WL 5474210, at *10 (W.D.N.Y. Sept. 30, 2013) (quoting *McConnell v. Astrue*, No. 6:03-CV-521, 2008 WL 833968, at *2 (N.D.N.Y. Mar. 27, 2008)).

An ALJ should make a finding of "'not severe' . . . if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to work.'" *Rosario v. Apfel*, No. 97 CV 5759, 1999 WL 294727, at *5 (E.D.N.Y. Mar. 19, 1999) (quoting Social Security Ruling ("SSR") 85-28, 1985 WL 56856, at *3 (1985)). Although an impairment may not be severe by itself, the ALJ must also consider "the possibility of several such impairments combining to produce a severe impairment . . . ." SSR 85-28, 1985 WL 56856, at *3. The Second Circuit has held that the step two analysis "may do no more than screen out *de minimis* claims." *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995). If the disability claim rises above a *de minimis* level, then the ALJ must undertake the remaining analysis of the claim at step three through step five. *Id.* at 1030.

Often, when there are multiple impairments, and the ALJ finds some, but not all of them severe, an error in the severity analysis at step two may be harmless because the ALJ continued with the sequential analysis and did not deny the claim based on the lack of a severe impairment alone. *Tryon v. Astrue*, No. 5:10-CV-537, 2012 WL 398952, at *3 (N.D.N.Y. Feb. 7, 2012) (citing *Kemp v. Commissioner of Soc. Sec.*, No. 7:10-CV-1244, 2011 WL 3876526, at *8 (N.D.N.Y. Aug. 11, 2011)). This is particularly true because the regulations provide that combined effects of all impairments must be considered, regardless of whether any impairment, if considered separately, would be of sufficient severity. 20 C.F.R. §§ 404.1523, 416.923; *Dixon*, 54 F.3d at 1031.

**B.    Application**

14

Plaintiff argues that the ALJ erred in finding that plaintiff's back, knee, and joint pain; plantar fasciitis; psychiatric impairment; and side effects[7] from her medication are not severe. (Pl.'s Br. at 7-11). The ALJ's discussion of severity was quite detailed. He found four severe impairments, including fibromyalgia; history of thrombophlebitis; dependence on prescription pain medication; and obesity. (T. 15). The ALJ found that notwithstanding diagnoses of back, hand, foot, hip, and knee "pain," plantar fasciitis; gastrointestinal reflux disease; tobacco abuse; and headaches, none of these impairments were severe. (T. 15-17). The ALJ also found that even though plaintiff was diagnosed with adjustment disorder, the mental impairment was not severe.

In addition to arguing that the ALJ erred in his determination, plaintiff argues that any error was not harmless because the ALJ did not consider the "diminishment to function from [plaintiff's back and knee conditions] and consequently does not consider [their effect] on Plaintiff's ability to function." (Pl.'s Br. at 9). However the ALJ specifically stated that, even though he found that some of plaintiff's impairments were not "severe," "the limiting effects of all claimant's impairments, even those that are not severe, were considered in determining the [plaintiff's] residual functional capacity assessed below." (T. 15). Thus, the ALJ did consider all of plaintiff's impairments in determining her RFC, even those that the ALJ found were not severe. Therefore, any error at Step Two was harmless.

In the alternative, this court also finds that the ALJ's severity determination was

---

[7] Plaintiff appears to argue that "side effects" from medications constitute a "non-exertional" impairment which is capable of being considered in Step Two of the disability analysis as "severe." (Pl.'s Br. at 11).

supported by substantial evidence. Plaintiff argues that the ALJ erred in stating that plaintiff's back pain and other joint pain was related to her fibromyalgia, when Dr. Denzien specifically stated that plaintiff's knee and back pain were separate from her fibromyalgia. (Pl.'s Br. at 8). Plaintiff correctly states that the ALJ may not substitute his own opinion for that of competent medical evidence. (*Id.* (citing *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998)).

The ALJ stated that "[t]he claimaint's back pain as well as her other joint pains are undoubtedly related to her fibromyalgia syndrome rather than the minimal degenerative changes in this young individual." (T. 15). Even if the ALJ erred in this statement, any error was harmless. As stated above, the ALJ considered all plaintiff's limitations in his ultimate RFC evaluation, and was justified in finding that plaintiff's other impairments were not "severe" even if they were not related to the fibromyalgia. On October 4, 2010, Dr. Sheth found that plaintiff had some swelling of the "right knee related to some fluid accumulation, but this has also resolved." (T. 202) (emphasis added). Dr. Sheth[8] then stated that plaintiff "had no decrease of appetite or weight loss and she had no other symptoms except her headache, occasional nausea, and her generalized aches and pains related to fibromyalgia." (*Id.*) His examination showed "unremarkable" bones and joints and no focal tenderness or deformity in her back. (*Id.*)

The ALJ noted that although plaintiff reported joint pain at times, "including pain in her back, hands, feet, hips, and knees . . . the clinical findings regarding the

---

[8] Plaintiff was referred to Dr. Sheth for evaluation of her thrombophlebitis. Dr. Sheth completed a physical examination. The record contains two reports by this physician. (T. 201-203, repeated at 451-53).

claimant's joints are consistently unremarkable." (T. 15). The ALJ is absolutely correct in this statement. The ALJ cited to the MRI and X-ray reports that consistently resulted in "unremarkable" or minimal results.[9] (T. 15). The ALJ discussed these findings extensively. Thus, while plaintiff's joint and back pain may not necessarily be related to her fibromyalgia,[10] the clinical findings do not support separate "severe" impairments due to the minimal clinical findings.

The ALJ noted that there was evidence of plantar fasciitis in mid-2012, but plaintiff's more recent treatment records made no mention of the condition, and at the hearing plaintiff did not assert any functional limitations as a result of the plantar

---

[9] The ALJ cited and discussed plaintiff's radiology reports at T. 270-71, 275. On April 5, 2011, plaintiff had an MRI of her spine. (T. 270-71). Although there were some "mild" changes and "minimal dessication" at various levels, the "Impression" states: "No evidence of disk herniation spinal stenosis or neural compression." (T. 270). There was "[m]inimal to mild disk degeneration and desiccation from T11-L3 levels with slight progression from T11-L1 levels. No significant disk bulge or annular tear." (T. 271). On April 20, 2010, plaintiff had a "Spine Scoliosis Study." (T. 275). There was a "mild" levo convex curvature/scoliosis of the lumbar spine, with "no significant scoliosis." (*Id.*) Plaintiff had "mild thoracic kyphosis and "mild" lumbosacral hyperlordosis. (*Id.*) She had mild to moderate thoracic spine disc degeneration with spondylosis in the mid and lower thoracic region. (*Id.*) The court notes that the X-rays of plaintiff's knees taken January 30, 2011 were "unremarkable." with no significant interval change regarding the right knee compared to the September 11, 2009 study. (T. 272). On April 20, 2010, plaintiff had an MRI of her thoracic spine. (T. 274). The impression was kyphoscoliosis with T12 wedge deformity, not believed to represent fracture. (T. 274). The radiologist opined that the findings could represent a "*mild*" form of adult Scheuermann's disease. (*Id.*) (emphasis added) Kyphosis is a curving of the spine that causes a hunchback. Scheuermann's disease is a type of kyphosis, occurring in teens, caused by the wedging of several of the spinal bones together. www.nlm.nih.gov/medlineplus/ ency/article/001240.htm. One of the symptoms is "mild back pain" and it may cause tenderness and stiffness of the spine. (*Id.*)

[10] The court does note that on February 24, 2011, PA Hodgeman stated that plaintiff came to the office complaining of shoulder, arm, and wrist pain. (T. 214). Her pain level was four out of ten. PA Hodgeman also assumed that the joint pain was probably an exacerbation of her fibromyalgia pain. He noted that, notwithstanding the pain, plaintiff had full range of motion of her elbow and wrist with minimal discomfort, and her grip strength was normal. (*Id.*) Thus, even her treating sources have assumed that some of plaintiff's joint pain is related to her fibromyalgia.

fasciitis.[11] (T. 15). Plaintiff reported to Dr. Magurno that her headaches were relieved by Topamax, and that plaintiff was "okay as long as she takes Topamax, but still gets headaches *periodically*." (T. 15 ) (citing T. 308) (emphasis added). Plaintiff told Dr. Magurno that when she got a headache she would lie down and take Tylenol, and the headache would be relieved in about a half-hour. (T. 308). There was no indication that plaintiff's hypothyroidism (controlled with medication); her GERD; her headaches; or her tobacco abuse (plaintiff had quit smoking) limited her from performing basic work activities.

With respect to plaintiff's diagnosis of adjustment disorder or depression, plaintiff argues that the ALJ "fails to assess any psychiatric impairment as severe because, he claims, "there is no evidence that the claimant undergoes direct mental health treatment." (Pl.'s Br. at 10). While the ALJ did comment that plaintiff did not undergo direct mental health treatment, that is far from the only reason that the ALJ found plaintiff's alleged psychiatric impairment was not "severe." (*See* T. 15-17). The ALJ noted that plaintiff had been diagnosed with adjustment disorder and considered the psychiatric review technique. The ALJ evaluated the "four broad functional areas for evaluating mental disorders." (T. 16-17). The ALJ concluded that "[b]ecause the claimant's medically determinable mental impairments cause no more than "mild" limitation in any of the first three functional areas and 'no' episodes of decompensation which have been of extended duration in the fourth area, they are non-severe. (20 C.F.R. 404.1520a(d)(1))." (T. 17). Clearly, the ALJ relied upon more than just the fact

---

[11] Plaintiff testified that she could walk the same distance before or after her feet began to bother her. (T. 63).

that plaintiff was not getting "direct mental health treatment." Thus, the ALJ's Step Two analysis is supported by substantial evidence.

## VII.  RFC/TREATING PHYSICIAN

### A.  Legal Standards

#### 1.  RFC

RFC is "what [the] individual can still do despite his or her limitations. Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. . . ."  A "regular and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule.  *Balles v. Astrue*, No. 3:11-CV-1386 (MAD), 2013 WL 252970, at *2 (N.D.N.Y. Jan. 23, 2013) (citing *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96–8p, 1996 WL 374184, at *2)).

In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations.  20 C.F.R §§ 404.1545, 416.945.  *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)).  An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities. *Martone v. Apfel*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984); *LaPorta v. Bowen*, 737 F. Supp. at 183; *Sullivan v. Secretary of HHS*, 666 F. Supp. 456, 460 (W.D.N.Y. 1987)).  The RFC assessment must also include a narrative discussion,

describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence. *Trail v. Astrue*, No. 5:09-CV-1120, 2010 WL 3825629 at *6 (N.D.N.Y. Aug. 17, 2010) (citing Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *7).

## 2. Treating Physician

While a treating physician's opinion is not binding on the Commissioner, the opinion must be given controlling weight when it is well supported by medical findings and not inconsistent with other substantial evidence. *See Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). If the treating physician's opinion is contradicted by other substantial evidence, the ALJ is *not* required to give the opinion controlling weight. *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). The ALJ must properly analyze the reasons that the report of a treating physician is rejected. *Id.* An ALJ may not arbitrarily substitute his/her own judgment for competent medical opinion. *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).

Notwithstanding the "treating physician rule," it is the province of the ALJ to consider and resolve conflicts in the evidence as long as the decision rests upon "adequate findings supported by evidence having rational probative force." *Galiotti v. Astrue*, 266 F. App'x 66, 67 (2d Cir. 2008) (citing *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002)). A conclusory statement of disability is not binding on the ALJ if that opinion is inconsistent with substantial evidence in the record. *Michels v. Astrue*, 297 F. App'x 74, 76 (2d Cir. 2008) (citing *inter alia Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *Veino*, 312 F.3d at 588. *See* 20 C.F.R. § 404.1527(e)(1) (a statement

by a medical source that a claimant is "disabled" does not mean that the Commissioner will make that determination). The term "disabled" is a legal not a medical definition. *Id.*

## B.    Application

The ALJ found that plaintiff could perform a full range of sedentary work. Plaintiff argues that, in making this finding, the ALJ failed to give proper weight to the RFC evaluations of her treating sources, including Dr. Denzien and PA Hodgeman,[12] and failed to properly weigh the other medical evidence. This court does not agree.

Plaintiff argues that treating sources, Dr. Denzien and PA Hodgeman submitted RFC evaluations which are inconsistent with sedentary work. While plaintiff cites the "restrictive" RFC evaluations, the ALJ also cited several of PA Hodgeman's reports which found that plaintiff was in no acute distress and had normal clinical findings. (T. 20). PA Hodgeman often referred to plaintiff's fibromyalgia and back pain as "stable." (T. 20) (citing T. 413, 411, 408, 404-405, 399, 395, 391, 389, 383, 376, 365). On October 7, 2011, PA Hodgeman stated that plaintiff was "doing pretty well pain-wise." (T. 395). On February 6, 2012, he stated that plaintiff's fatigue[13] was "stable for the

---

[12] The regulations state that a PA is not an acceptable medical source to *establish* an impairment. A PA's opinion may be considered in determining the extent of the plaintiff's restrictions based on the diagnosis of an acceptable medical source. 20 C.F.R. §§ 404.1513(d)(1). However, when the PA's findings are at odds with a physician's findings, the ALJ is entitled to reject those findings, as he is entitled to reject other inconsistent findings. It is the province of the ALJ to resolve conflicts in the record. *Micheli v. Astrue*, 501 F. App'x 26, 29-30 (2d Cir. 2012) (It is the sole responsibility of the ALJ to weigh all the medical evidence and resolve any material conflicts in the record).

[13] Fatigue was one of the alleged side-effects of plaintiff's medications. However, on August 25, 2010, Dr. Denzien was concerned about plaintiff accepting a Valium, given to her by a friend, and "tried that just to see if it would be something that I would be interested in prescribing her." (T. 233). Dr. Denzien told plaintiff that getting controlled substances from other people was illegal and against

most part," and her "pain level was actually pretty good today." (T. 387). On August 31, 2012, PA Hodgeman stated that plaintiff had no new complaints of fatigue." (T. 367). On October 3, 2012, he stated that plaintiff's fibromyalgia was "relatively stable," her pain was only at a level three out of ten, her insomnia was stable, and "otherwise," plaintiff felt "pretty well" on the current medications. (T. 365).

The October 24, 2012 RFC states that plaintiff could sit for "less than" six hours per day and could stand for "less than" two hours in an eight hour day.[14] (T. 349-50). In the November 1, 2010 RFC evaluation, Dr. Denzien stated that plaintiff was not "totally disabled," but could only work for four hours per day. (T. 227-28). She opined that plaintiff could occasionally lift and carry up to ten pounds and could push and pull up to thirty pounds.[15] (T. 228). The ALJ gave these two RFC evaluations little weight,

---

her narcotics contract. (*Id.*) The doctor also stated that plaintiff's thyroid problem could explain "a lot of the fatigue and the other issues she was having." (T. 233). Thus, plaintiff's fatigue could also have been related to her thyroid, and Dr. Denzien stated that she was going to prescribe medication for that condition. On April 16, 2010, Dr. Denzien expressed concern that plaintiff was "over-using her medications," taking two Oxycodone at a time. (T. 239).

[14] It appears that this RFC was prepared by PA Hodgeman and then signed by both PA Hodgeman and Dr. Denzien.

[15] In Dr. Denzien's October 13, 2010 narrative report, she stated that she discussed job training with plaintiff. (T. 229). On November 1, 2010, plaintiff was again seen by Dr. Denzien. (T. 224). Plaintiff arrived with "paperwork." Plaintiff was told that she would have to be able to work at least fifteen hours in order to use the Office of Vocational and Educational Services for Individuals with Disabilities ("VESID") program. Dr. Denzien stated that plaintiff also had Social Security paperwork with her. Dr. Denzien was not sure that the plaintiff would be able to find anything she could do, but she was "more than willing to let her try." (T. 224). The November 1, 2010 RFC which was written on a VESID form was apparently created as a result of the those discussions with plaintiff. In her October 13, 2010 report, Dr. Denzien stated that she was having a "difficult time" picturing any jobs that plaintiff could perform with her limitations. The doctor stated that plaintiff could not perform a job with "recurrent" lifting, and because plaintiff was having trouble with carpal tunnel syndrome, "typing and keyboarding" would be a challenge. (*Id.*) Sedentary work does not require "recurrent" lifting, and plaintiff testified at the hearing that she no longer had trouble with her wrists. (T. 44). She stated that the wrist problem was "a past one." (*Id.*) Thus, at least one limitation that Dr. Denzien believed would

finding that they were inconsistent with the longitudinal medical evidence of record "including their own extensive treatment notes." (T. 22). The ALJ also pointed out that the more recent RFC evaluation utilized counsel's own "check-box" form "that results in remarkably similar responses from case to case." (T. 22) (citing T. 349-53).

A review of the two RFC forms indicates that the ALJ's determination is supported by substantial evidence. The forms were completed two years apart. By just looking at the forms, it would appear that plaintiff's condition deteriorated because her alleged RFC was substantially more restricted in the second report. However, the treating sources' narrative reports from 2012 do not indicate that plaintiff's condition deteriorated, nor do their progress notes support the degree of restriction that appears in the RFC evaluations. The ALJ listed several reports from PA Hodgeman in 2012 in which plaintiff's symptoms were listed as stable and her pain was at a low level on the pain scale. (T. 20). Additionally counsel's check-box form (the 2012 RFC) does not allow the physician to specify how many hours per day that the patient can sit, stand or walk.[16]

---

keep the plaintiff from working was not present after the doctor completed the 2010 RFC. On October 4, 2010, Dr. Sheth stated that plaintiff had fibromyalgia, but no other serious medical condition, her bones and joints were "unremarkable," and there was no focal tenderness or deformity in her spine. (T. 202-203). In his "Review of Systems," Dr. Sheth stated that plaintiff had no neurologic symptoms, bone pain, or joint pain." (T. 202). On October 18, 2010, Dr. Sheth concluded that even though plaintiff had recurrent thrombophlebitis, there was no underlying hypercoagulable state." (T. 201).

[16] The choices are restricted to "[c]an sit for six or more hours out of an eight hour day"; "[c]an sit for less than six hours out of an eight hour day"; "[c]an sit for less than six hours out of an eight hour day AND needs to alternate positions between sitting and standing"; and "[c]an sit for six hours out of an eight hour day but must alternate between sitting and standing." (T. 349). The next section first refers to standing and walking, but the check-box part of the form only refers to standing: "[c]an stand for six hours out of an eight hour day"; "[c]an stand for at least two hours out of an eight hour day"; or "[i]s not able to stand for two hours out of an eight hour day." (T. 350). The court would point out that sedentary work refers to an ability to "stand and walk" for two hours out of an eight hour day, not to

23

In November of 2010, Dr. Denzien stated that plaintiff could lift and carry 0 to 10 pounds and could push and/or pull from 10 to 30 pounds, while in 2012, plaintiff could only lift up to five pounds up to three hours per day. (T. 228, 350). In 2010, Dr. Denzien found that plaintiff had *no* limitations sitting in an ergonomic chair,[17] had "some" limitations standing and walking, but had no limitations in working at a high rate of speed, working around moving machinery, and on unprotected heights, while in 2012, the RFC form indicated that plaintiff would be "severe[ly]" limited in her ability to sustain work pace. (T. 228, 350).

The ALJ also gave no weight to one-time independent examiner Dr. Lawrence Weisner, D.O. The ALJ pointed out that Dr. Weisner's August 10, 2012 narrative report was at odds with his check-box RFC. (T. 22). Dr. Weisner stated in his narrative report that plaintiff would have "moderate" restrictions for prolonged sitting, but then checked the most restrictive category on the RFC form (sitting less than two hours in an eight hour day). (T. 335-47). The court would also point out that in the section of the form that refers to "weight," there is no indication whether the weight restriction is for lifting, carrying or both. (T. 337). Finally, Dr. Weisner opines that plaintiff would have "marked" difficulty with concentration and ability to sustain work pace. (T. 338). There is no indication of how he made this determination.

The ALJ points out that in his RFC evaluation, Dr. Weisner listed a diagnosis of

standing alone.

[17] It is also unclear from the report whether the limitations listed applied only to the four hours that the doctor said plaintiff could work on the front page of the report. (T. 227-28). The court understands that this RFC was completed for VESID when plaintiff wished to use those services.

degenerative disc disease "with intermittent radiculopathy" in plaintiff's low back, but there is no mention in his narrative report that he examined her low back. The ALJ stated that there was no showing that Dr. Weisner had access to any of the MRI or x-ray reports. (T. 22). In fact, the x-rays of plaintiff's lumbar spine were "unremarkable,"[18] and an MRI of plaintiff's lumbar spine on April 5, 2011 showed "no evidence of disk herniation, spinal stenosis or neural compression." (T. 270). Thus, the ALJ determined that Dr. Weisner must have strictly transferred plaintiff's alleged symptoms into his diagnostic formulation. (T. 22). The MRI report confirms this finding. The ALJ's determination to give no weight to Dr. Weisner's report is supported by substantial evidence.

Instead, the ALJ gave significant weight to the consultative reports completed by Dr. Magurno (physical) and Dr. Long (psychological), finding that both reports were compatible with the ability to do a full range of sedentary work, "assuming" that moderate limitations on lifting and carrying would allow occasional lifting and carrying of ten pounds. (T. 21). Plaintiff takes issue with Dr. Magurno's use of the terms "assuming" and "moderate." (Pl.'s Br. at 12). Plaintiff cites *Curry v. Apfel*, 209 F.3d 117, 123-24 (2d Cir. 2000) as holding that vague terms such as "moderate" restrictions are insufficient bases for making an RFC determination. While this general statement may still be true, more recent cases have held that when there is other medical evidence in addition to an RFC evaluation using terms such as "mild" and "moderate," such terms may properly be used in the RFC analysis. *See Tankisi v. Commissioner of SS*,

---

[18] (T. 446) (dated October 11, 2011).

521 F. App'x 29, 34 (2d Cir. 2013).

Dr. Magurno found that plaintiff appeared to be "in no acute distress," her gait was normal, she could stand on her heels and toes, do a full squat, had a normal stance, used no assistive devices, and needed no help changing for the examination or getting on and off the examination table. (T. 309). Her cervical spine showed full flexion, extension, lateral flexion and full rotary movement bilaterally. (T. 310). She had kyphosis, but her lumbar spine showed 50 degrees of flexion, extension to 15 degrees, and full lateral flexion and rotary movement bilaterally. (*Id.*) She had full range of motion in her upper extremities, except her shoulder elevation was 130 degrees. She had full range of motion in her hips, knees, and ankles bilaterally, with no evident subluxations, contractures, ankylosis, or thickening. Her joints were stable and non-tender, and there was no redness, heat, swelling, or effusion. (T. 310). She did have twelve out of eighteen fibromyalgia trigger points. (*Id.*) No sensory deficits were noted, and she had full strength in her upper and lower extremities. (T. 311). She had some edema in her lower calves, but her pulses were physiologic and equal with no significant varicosities. No muscle atrophy was evident. Her hand and finger dexterity were intact, and her grip strength was 5/5 bilaterally.

While Dr. Magurno used the term "moderate" limitations in her assessment, the term was applied to "bending, lifting, carrying, reaching, pushing, and pulling." (T. 311). Dr. Magurno stated that plaintiff had "[n]o limitations . . . for sitting standing, walking, squatting, speech, hearing, or fine motor skills." (*Id.*) "Moderate" limitations in lifting and carrying would be consistent with an ability to lift and/or carry ten pounds

occasionally and less than ten pounds frequently. Dr. Magurno found no limitations with respect to the central requirement for sedentary work, "sitting." "No" limitation on sitting is clearly compatible with sedentary work. *See* 20 C.F.R. § 404.1567(a) ("a sedentary job is defined as one which involves sitting"); Social Security Ruling ("SSR") 96-9p, 1996 WL 374185, at *3. Sedentary work "generally involves up to two hours of standing or walking and six hours of sitting in an eight-hour work day." *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996) (citing SSR 83-10, 1983 WL 31251, at *5).

The ALJ also clearly considered plaintiff's non-exertional impairments,[19] including her mental impairment in her RFC, even though he determined that plaintiff's mental impairment was not severe. (T. 21-22). The ALJ specifically gave "significant" weight to Dr. Long's consultative psychological examination (T. 302-306) and Dr. Blackwell's psychiatric technique evaluation.[20] (T. 313-26). The ALJ discounted Dr. Russell's evaluation (T. 331-34) because it did not contain an appropriate function-by-function assessment of plaintiff's work-related abilities. (T. 21-22).

---

[19] Plaintiff argues that the RFC did not take non-exertional limitations into account (Pl.'s Br. at 17-18), however, this court does not agree.

[20] Plaintiff argues that the opinion of a non-examining physician is insufficient to constitute the requisite substantial evidence to override the treating physician. (Pl.'s Br. at 20). Counsel then states that Dr. Blackwell did not even complete the psychiatric technique form, and thus, the ALJ's reliance on the report was questionable. (*Id.*) First, the ALJ did not utilize only Dr. Blackwell's report. The ALJ relied upon Dr. Long's consultative report, and discounted Dr. Russell's report. The ALJ mentioned Dr. Blackwell because she found that plaintiff's mental impairment was not severe. The opinions of non-examining sources may be considered and may even override a treating source's opinion provided that the non-examining source's opinion is supported by the evidence in the record. *See Netter v. Astrue*, 272 F. App'x 54, 55-56 (2d Cir. 2008) (citations omitted); *Diaz v. Shalala*, 59 F.3d 307 n.5 (2d Cir. 1995); *Wilkes v. Colvin*, No. 6:13-CV-856, 2015 WL 58390, at *5 (N.D.N.Y. Jan. 5, 2015) (citations omitted). Plaintiff's comment that Dr. Blackwell did not complete the form is misplaced. Since Dr. Blackwell found that the plaintiff's impairment was not severe, the entire form did not need to be completed. (T. 313). In any event, it is clear that the ALJ did not rely solely upon Dr. Blackwell's report.

A review of Dr. Russell's March 29, 2012 evaluation supports the ALJ's findings. Dr. Russell reviewed plaintiff's family history and stated that plaintiff had never received mental health services, although her physician started her on Abilify nine months prior to Dr. Russell's examination. (T. 332). Plaintiff told Dr. Russell that her "bad moods" had lessened, and she did not view herself as depressed as previously. She was pushing herself to be more active and social. Dr. Russell noted that plaintiff was diagnosed with fibromyalgia and degenerative disk disease, and that she had been on Oxycodone for an extended period of time. (T. 332). After reviewing plaintiff's work history, Dr. Russell stated that "[t]his woman does not believe that she is able to work," and that she believed that her memory was "shot." However, she stated that she thought her memory was poor when she was working as a mail clerk. (T. 333).

Dr. Russell's "clinical observations" were that plaintiff presented as neatly dressed and groomed. She was cooperative, but had difficulty giving examples of her problems and symptoms. Her affect was sad, but there was no evidence of a disorder of thought process or thought content. (*Id.*) Dr. Russell stated that plaintiff "does appear to meet the criteria for an adjustment disorder with depressed mood." He did note that with plaintiff's abundance of medications, she was likely to feel sleepy during the day, but she was taking medication to counteract this. (T. 334). Dr. Russell repeated his statement that "[c]urrently this woman believes that she is unable to work due to her attention, concentration and memory." Dr. Russell found that these "cognitive weaknesses" were cause by her various medications, and that being on high doses of opoids will cause problems with attention and perhaps, short term memory.

However, in Dr. Russell's conclusion, he stated that it was "undetermined" whether plaintiff would qualify for disability, and that she "may" experience cognitive difficulties in addition to the chronic pain, but "[n]o formal cognitive testing was performed . . . ." (T. 334). Dr. Russell never appears to come to a conclusion about any of plaintiff's limitations. Instead, he focuses on plaintiff's "belief" that she is unable to work. The ALJ was correct in finding that Dr. Russell's report did not discuss plaintiff's ability to work with a function-by-function analysis.

By contrast, Dr. Long tested plaintiff's attention and concentration as well as her recent and remote memory skills. (T. 303). Dr. Long determined that plaintiff would be able to follow and understand simple instructions and to perform simple tasks independently. (T. 304). She would be able to learn new tasks, maintain attention and concentration, maintain a regular schedule and make appropriate decisions. Dr. Long determined that the results of her evaluation were consistent with psychiatric problems, "but in itself, this does not appear to be significant enough to interfere with her ability to function on a regular basis." (*Id.*)

In his analysis, the ALJ also pointed out the weaknesses that he found in both Dr. Long's and Dr. Magurno's reports[21], but ultimately determined that these reports were consistent with an ability to perform a full range of sedentary work. As stated above, it is the province of the ALJ to resolve conflicts in the evidence. *Galiotti v. Astrue*, 266 F. App'x at 67. Thus, the ALJ's determination that plaintiff can perform a full range of

---

[21] The ALJ noted that some of Dr. Magurno's opinions were "somewhat non-specific" and that Dr. Long's comment about plaintiff's stress threshold was somewhat inconsistent with her conclusion that the claimant is able to adequately manage stress. (T. 21). However, both of the opinions were "completely compatible" with the ability to perform sedentary work. (*Id.*)

sedentary work is supported by substantial evidence.

## VIII. **VOCATIONAL EXPERT**

### A. **Legal Standards**

Once the plaintiff shows that she cannot return to her previous work, the Commissioner bears the burden of establishing that the plaintiff retains the RFC to perform alternative substantial gainful work in the national economy. *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004). In the ordinary case, the ALJ carries out this fifth step of the sequential disability analysis by applying the applicable Medical-Vocational Guidelines ("the Grids"). *Id.* The Grids divide work into sedentary, light, medium, heavy, and very heavy categories, based on the extent of a claimant's ability to sit, stand, walk, lift, carry, push, and pull. 20 C.F.R. Pt. 404, Subpt. P, App. 2; *Zorilla v. Chater*, 915 F. Supp. 662, 667 n.2 (S.D.N.Y. 1996). *See also* 20 C.F.R. §§ 404.1567 & 416.967. Each exertional category of work has its own Grid, which then takes into account the plaintiff's age, education, and previous work experience. *Id.* Based on these factors, the Grids help the ALJ determine whether plaintiff can engage in any other substantial work that exists in the national economy. *Id.*

"Although the grids are 'generally dispositive, exclusive reliance on [them] is inappropriate' when they do not fully account for the claimant's limitations." *Martin v. Astrue*, 337 F. App'x 87, 90 (2d Cir. 2009) (citation omitted). When significant nonexertional impairments[22] are present or when exertional impairments do not fit

---

[22] A "nonexertional" limitation is a limitation or restriction imposed by impairments and related symptoms, such as pain, that affect only the claimant's ability to meet the demands of jobs other than the strength demands. 20 C.F.R. §§ 404.1569a(c), 416.969a(c). Mental impairments are clearly nonexertional.

squarely within Grid categories, the testimony of a vocational expert is required to support a finding of residual functional capacity for substantial gainful activity. *McConnell v. Astrue*, 6:03-CV-0521 (TJM), 2008 WL 833968, at *21 (N.D.N.Y. Mar. 27, 2008) (citing, *inter alia*, *Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir. 1986).

"If a claimant has nonexertional limitations that 'significantly limit the range of work permitted by his exertional limitations,' the ALJ is required to consult with a vocational expert[,]" rather than relying solely on the Grids. *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (*citing Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir. 1986)).  The mere existence of a nonexertional impairment does not automatically require consultation with a vocational expert, nor does it preclude reliance on the Guidelines. *Bapp v. Bowen*, 802 F.2d at 603.  The requirement for a vocational expert is triggered when a nonexertional impairment causes an "additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity." *Id*. at 605-06.  The appropriateness of applying the Grids and the necessity for expert testimony must be determined on a case-by-base basis. *Id*. at 605.

## B.    Application

In this case, plaintiff argues that the ALJ erred in failing to call a VE to testify regarding plaintiff's ability to perform sedentary work.  Plaintiff argues that her exertional and non-exertional impairments significantly limit the amount of sedentary work that she can perform.  In making his determination, the ALJ also assessed

plaintiff's credibility.[23] The ALJ found that plaintiff's statements as to the intensity, frequency, and limiting nature of her impairments was not fully credible. (T. 21). The ALJ noted that the mere existence of non-exertional impairments does not automatically require the production of a VE, nor does it preclude reliance on the Grid. (T. 24). Because this court has found that the ALJ properly weighed the medical evidence and determined that plaintiff could perform the full range of sedentary work, a VE was not required.

WHEREFORE, based on the findings above, it is

RECOMMENDED, that the decision of the Commissioner be affirmed, and the plaintiff's complaint be DISMISSED.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file

_____

[23] The ALJ pointed out that plaintiff collected unemployment insurance throughout 2011 which would have required her to attest that she was willing and able to work. (T. 19). Plaintiff's testimony also belied her claims of disabling pain. The ALJ asked plaintiff whether she could drive, and she initially stated: "No, I drive every day, more so to get to my mom's house to have dinner, but I don't try not to drive very often." (T. 33). The plaintiff testified that she did not cook, but it was because she was not good at it, not because she was physically unable to do so. (T. 19, 55). Although Dr. Weisner stated that plaintiff would sometimes have to lie down at unpredictable intervals two to three times daily, when the ALJ first asked plaintiff how much time she spent lying down, plaintiff stated "Not a whole heck of a lot of the time. I sit on the couch a lot." (T. 49). However, when the ALJ stated "[w]ell, you said you had to lay down . . . ," then the plaintiff stated that she had to lay down "[a] couple of times a day." (Id.) Plaintiff also never answered the ALJ's question regarding the length of time that she could sit or stand before the pain would start. (T. 49-55). However, when her attorney questioned her, she was quick to state that she could only sit for 15 minutes before she had to stand up or lie down. (T. 62). She also stated that she could only stand for 10 minutes before she had to sit down or lie down. (Id.) However, she also testified that she went shopping with her mother for approximately two hours, and although she was careful to state that her mother "carried" everything, she never mentioned having to sit or lie down every 10 or 15 minutes. "An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'" Lewis v. Apfel, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) (quoting Gallardo v. Apfel, No. 96 CIV 9435, 1999 WL 185253, at *5 (S.D.N.Y. March 25, 1999)). The ALJ in this case properly considered plaintiff's credibility together with the minimal clinical findings in making his RFC determination.

written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN 14 DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: May 4, 2015

Hon. Andrew T. Baxter
U.S. Magistrate Judge